**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

— — —

UNITED STATES OF AMERICA,

   Plaintiff,

 v.          Case No. 20-20233

LAVAR CARTER,

   Defendant.
_____/

**SENTENCING**
**BEFORE THE HONORABLE BERNARD A. FRIEDMAN**
**United States District Judge**

Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Wednesday, March 8, 2023

**APPEARANCES:**

**For the Plaintiff:**  Randall M. Lewis
         Loren M. Dickstein
         LEWIS & DICKSTEIN, PLLC
         2000 Town Center, Suite 2350
         Southfield, Michigan  48075
         (248) 263-6800

**For the Defendant:**  Philip A. Ross
         UNITED STATES ATTORNEY'S OFFICE
         211 W. Fort Street, Suite 2001
         Detroit, Michigan  48226
         (313) 226-9790

*To obtain a copy of this official transcript, contact:*
*Sheila D. Rice  Official Court Reporter*
*(313) 234-2610 • sheila_rice@mied.uscourts.gov*

TABLE OF CONTENTS

MATTER_____PAGE

**<u>SENTENCING</u>**

Proceedings........................................... 6
Certificate of Court Reporter........................

E X H I B I T   I N D E X

| Exhibit No. | Description | Identified | Admitted |
| --- | --- | --- | --- |
| None | | | |

Detroit, Michigan

Wednesday, March 8, 2023

11:42 a.m.

—   —   —

THE COURT:  This is the matter of the United States versus Lavar Carter, Case Number 20-cr-20233.  This case is under seal.

Is there anyone -- the attorneys are here on both sides.  Anyone here that should not be here, by the Government?

MR. ROSS:  Your Honor --

THE COURT:  I know we should introduce who is here.

MR. ROSS:  Thank you, your Honor.

THE COURT:  That's a good idea.

MR. ROSS:  Philip Ross appearing on behalf of the United States.  I'm joined in the courtroom by Special Agent Allison Woodard with the FBI, internally is Pretrial Services. And if you would join me at the table, counsel table, please. And then I'm also joined by an FBI analyst named Grace.  And I apologize, Judge, I don't know her first name.

Grace, what's your last name, please?

MS. VANLAANEN:  Vanlaanen.

MR. ROSS:  What?

MS. VANLAANEN:  Vanlaanen.

MR. ROSS:  Grace Vanlaanen --

THE COURT:  Okay.

MR. ROSS: -- who's an investigative analyst with the FBI, and her work is -- I can address that.

THE COURT: That's fine, as long as no one has any objection that she's okay.

MR. ROSS: The only thing I would add is the Government has not requested, and I don't have an objection, but I need to make clear the Government is not requesting the courtroom be sealed.

THE COURT: Oh, you're not? I thought you were.

MR. ROSS: No. The pictures that were referred to -- I have a couple things. There were some pictures that might have prompted the court's case manager to be concerned about whether or not the record should be sealed. There was some surveillance photos that --

THE COURT: It's not the parties -- the parties didn't make the motion?

MR. ROSS: The Government did not --

THE COURT: Okay. The defense? I'd rather not have it, you know, but if the parties have no objection I think we can just open the door if we're not going to invite people in. I don't think anybody's going to come anyhow. I would rather not be under seal, because there's no reason to I don't think either, but I thought the parties stipulated to it. The defense has a right to have an open courtroom, so ...

MR. ROSS: As do the people of the United States.

THE COURT: Yes, both sides. But I just thought both sides agreed to it. So let's open the door.

THE CLERK: Judge, I thought they agreed to it also. That's why I --

THE COURT: Yeah.

MR. DICKSTEIN: The only people in the hallway are my client's immediate family.

THE COURT: That's fine. If you see somebody that maybe is questionable, one side or the other, let me know and then we can --

MR. ROSS: And I would like the Defendant to have the opportunity to have his family in the courtroom.

THE COURT: Yeah.

MR. ROSS: I don't see any --

THE COURT: The CSO is going to get them right now. He's right out there. And anybody else that wants can come in. If for some reason you see somebody that you think would be dangerous to your client or to the Government, let me know. We'll --

MR. ROSS: Judge, would it be okay for me to ask the Defendant to sit next to his attorneys over there as opposed to right here --

THE COURT: Sure.

MR. ROSS: -- a security issue I just want to be clear about.

MR. ROSS:  Ms. Vanlaanen, can we get the spelling of your name for the court reporter while we're -- can you stand up and spell your name, please.

MS. VANLAANEN:  V-A-N --

MR. ROSS:  V-A-N.

MS. VANLAANEN:  L --

MR. ROSS:  L.

MS. VANLAANEN:  A-A --

MR. ROSS:  A-A.

MS. VANLAANEN:  N-E-N.

MR. ROSS:  N-E-N.  Did I get it right?

MS. VANLAANEN:  Yes.

MR. ROSS:  All right.  Thank you.

THE COURT:  Okay.  Let the record reflect some folks came into the courtroom.  You are certainly welcome.  And, if you have other people that you want to invite into the courtroom, everybody's welcome.  We made a mistake.  We thought this was going to be sealed.  It's not sealed.  I'm going to recall -- not recall.  I'm going to call the case again.  I guess it's called a recall.

The number is 20-cr-20233, People versus Lavar Carter. And may we have appearances, please, starting with the Government.

MR. ROSS:  For the record, Philip Ross appearing on behalf of the United States.  At counsel table I'm joined by

FBI Special Agent Allison Woodard as well as we're joined by Investigative Analyst Grace Vanlaanen who is with the FBI.  And that concludes the Government officials in the courtroom this morning.

THE COURT:  That's good.  And defense?

MR. LEWIS:  Your Honor, my name is Randall Lewis.  I am co-counsel for Mr. Lavar Carter, and he is seated to the right.

THE COURT:  Okay.

MR. DICKSTEIN:  My name is Loren Dickstein.  I also represent Mr. Carter, your Honor.

THE COURT:  Let the reflect that today's the -- you may be seated.  Thank you.  Today's the date scheduled for a sentencing in this matter.  The court has before it, I have the presentence report, which my understanding each side has been provided a copy of it.  I also have attached to that presentence report many objections filed on behalf of both the Government and the Defendant, which is a very unusual circumstance, but certainly I've had a chance to read those.

And I also have before me a sentencing memorandum filed on behalf of the Government.  I have a sentencing memorandum on behalf of the defense together with a request for downward departure and variance from the guidelines.  And attached thereto are many exhibits, some of which include letters which the court has had an opportunity to review, and

some other exhibits that have been attached to that document. And that's what I have before me.

Is there anything that I do not have before me -- I'm sorry.  I also have a report from the Pretrial Services that he's complied with all of those conditions.  And I also have a -- I guess it's a E-mail from Mr. Lewis, and I note that Mr. Ross has been copied on it also.  And there's several pictures attached thereto.  Honestly, I'm not sure exactly what that means, but we can talk about that.

Is there anything that I have not indicated that I have that I should have, starting with the Government?

MR. ROSS:  Your Honor, I can solve one issue.  The Government is not going to rely today on the pictures at all. The agent, Agent Woodard, brought to my attention just before your Honor called the case a concern that the bureau has that they can no longer definitively testify that the pictures -- that the individual in the picture is Mr. Carter.  And so that has some bearing on the Government's argument for detention. It is not dispositive.  We have additional information in addition to the presumption under the Bail Reform Act that will support motion to have his bond revoked.  So that's one issue.

The second issue is Mr. Dickstein has asked me if I would ask your Honor to permit us to approach you and have an off the record --

THE COURT:  Of course.  Off the record?

MR. DICKSTEIN: Yes, your Honor.

THE COURT: Yeah, sure. Come on up.

(At 11:49 a.m., sidebar off the record. Back on the record at 11:58 a.m.)

THE COURT: Let the record reflect my law clerk just handed me the addendum. Let me just take a minute to read it and then we'll complete our ...

(Briefly off the record.)

THE COURT: Okay. Let the record reflect I have now read the addendum, which was filed under seal, and it was filed back in February, February 27th, but for some reason I didn't get it, but I do have it now and I have had an opportunity to read it. So let me go over just one more time what I have, and I think -- and hopefully I will have everything.

I have read the presentence report. I've read the report from the Pretrial Services that is dated March 3rd. I have read the Government's sentencing memorandum. I have read the Defendant's sentencing memorandum together with all its attachments. And I have now read the amendment to the Defendant's sentencing memorandum asking for basically -- or providing more information for the request for a downward departure.

Now, do I have everything -- have I read everything? The Government?

MR. ROSS: The Government has nothing further to add,

your Honor.  Thank you.

THE COURT:  Defense?

MR. LEWIS:  The defense has nothing further in regards to what the court has received.

THE COURT:  Okay.  And Probation, I don't know if he got the amendment, but we'll get one to you.  I see we have a lot of probation officers.  Tell me who's who?

PROBATION OFFICER:  Lisa France, U.S. Probation.

PROBATION OFFICER:  And I'm Reginald King, U.S. Probation.

THE COURT:  Have we met before?

PROBATION OFFICER:  Yes.

THE COURT:  You're on this case or just watching?

PROBATION OFFICER:  Just watching.

THE COURT:  Good.

PROBATION OFFICER:  Good afternoon, your Honor.  Brian Harmon, Pretrial Services.

THE COURT:  Good to see you.  I just wanted to make sure everybody is accounted for.

Okay.  I'll start with the Government in terms of allocution.  We've got to do the objections first, and they're fairly voluminous.

Let me ask a question of both sides.  If I were to tell you that I was going to depart downward and that even most of these objections, if I depart downward, they would be pretty

moot, but we can argue if you want.  But it's my intention to depart downward.  No use spending a lot of time on a lot of objections that both of you have.  But I will, of course, leave all the objections in the record, but I can decide them if you want.  Just in the interest of time, unless I hear something here that would change my mind, I have definitely an inclination to depart downward.

MR. ROSS:  Your Honor, the United States is satisfied that the court has had an opportunity to review in full the joint objections that were filed, and we see no reason why the United States has any reason to supplement the record.  And we're satisfied with the direction of travel your Honor is suggesting.

THE COURT:  Okay.  How about the defense?

MR. DICKSTEIN:  On behalf of Mr. Carter, your Honor, we're also satisfied with the written arguments that have been provided to the court.

THE COURT:  Good.  And let the record reflect that those arguments and those objections are still on the record. I'm just not deciding them today, because I don't think there's a reason to go over them and because they are joint and I understand the position of both sides.

Okay.  That's great.  So let's talk about the sentencing and what each side --

Oh.  The other thing I just wanted to mention.  5K I

haven't seen in so long.  I can't tell you the last time I saw the Government make a 5K motion, because it's generally done based upon 3553, but it's good to see one even though it was made for the Defendant, not the Government.

So, okay, you may argue, Counsel.

MR. ROSS:  Thank you, your Honor.  So I appreciate the assistance I've received from defense counsel, because I'm the newest federal prosecutor in this case.  So I've been spending some time becoming more familiar with the facts, and so I certainly appreciate the information I received from them.

I understand their position that Mr. Carter's debriefing was sufficient to merit a 5K motion that would have to be approved by the criminal chief, Mr. Hurley, in our office.

Before Ms. McCullough left on her vacation, she came to my office specifically and informed me that our office would not be filing a motion for downward departure, because we were of the view that Mr. Carter had not accepted responsibility, which is the condition precedent to us filing a 5K, one of them.

We were concerned about based upon the information the FBI has provided and that I referenced in the Government's sentencing memo that there were a number of cell phone calls that are associated with numbers the FBI believes are linked to Mr. Carter.  They're not Mr. Carter's -- they're not in Mr.

Carter's name; is that right, Agent Woodard?

AGENT WOODARD:  That's correct.

MR. ROSS:  But we believe that they are linked to Mr. Carter -- you know, to persons and individuals associated with Mr. Carter and that --

THE COURT:  Linked to him by use, not in name?

MR. ROSS:  I'm sorry?

THE COURT:  They're linked to him because of use?

MR. ROSS:  Use and by the context of the messages that seem to suggest that he was engaging in new criminal conduct of the exact variety to which he pleaded guilty, which in the Sixth Circuit would justify the court not assessing a three-point reduction for acceptance of responsibility.

In the Government's view, it's our prerogative as to whether or not we file a 5K.  We do that based on whether or not we can trust the defendant is a cooperator, and that's something that we weigh individually.

And I know that Ms. McCullough is a longstanding AUSA held in high regard in this courthouse, as is Mr. Hurley.  And the information I have from my superiors is the information he's provided as well as his conduct do not merit and qualify him for a 5K downward departure.  Thank you.

THE COURT:  Thank you.  Counsel.

MR. DICKSTEIN:  Your Honor, would you like just a response to that argument or our allocation as well?

THE COURT:  Both, please.

MR. DICKSTEIN:  Thank you, your Honor.

Your Honor, with regard to that argument, obviously the Government's investigations do not always run perfectly, and that is testament to that there are photographs that were provided to the court, believed at one time to be Mr. Carter, and now I think the Government has learned that it's not Mr. Carter.  So I understand that they believe that that cell phone is attributable to Mr. Carter, but I don't know what the facts ultimately will bear out.

And I understand the Government is asking for the two points that they don't have a role in providing Mr. Carter as a result of acceptance of responsibility to be withdrawn, but should Mr. Carter be indicted and be acquitted Mr. Carter doesn't get to have a do-over on this sentencing, and that seems to me to be patently unfair.

Furthermore I think that this case stands out, because this isn't a situation where someone gets two or three points off just because of a plea.  Mr. Carter met with law enforcement, I believe, three times for hours at a time accepting responsibility and discussing his involvement in this particular offense.  So I think it's almost a case of super acceptance of responsibility as it relates to his culpability in this offense.

I understand the Government has some discretion with

regard to the third point. And I, of course, will understand that the court has to abide by that.

With regard to the additional two points, I do think Mr. Carter has earned his acceptance of responsibility as it relates to those two points, and I'd ask that they be granted to him.

And then as it relates to allocation, your Honor, I point out that my client was born in 1977. As many Defendant's come before you and have troubled backgrounds, Mr. Carter had a exceptionally troubled background. His mom, who was in prison basically from the time he was born until he was nine years old, out for a very short time and then back in prison until he was 13. And his dad he had virtually no contact or involvement with. Then he was not even in the picture. So he had very little in terms of parental guidance, and what guidance he did have was from his mother who suffered from a variety of her own troubles, including addiction and criminal problems.

He is a long-term resident of the Southeastern District of Michigan, in Oakland County specifically. He lives with his wife and children who are here in the courtroom and very, very supportive of him. He plans upon his release from the Bureau of Prisons to return home with them and provide for them both emotionally as well as contribute again financially.

Your Honor, he does not plan to waste his time in prison. He does and he has expressed to Probation that he's

very motivated to rehabilitate, learn a trade, lose weight, get in better health, maintain long-term sobriety, which has truly been a terrible problem for him in his life, and return an improved man, husband and father.

Your Honor, his health is not good.  He, of course, does have the addiction to alcohol and marijuana.  He has a severe form of asthma, acid reflux, and is still in need of an additional surgery for his hernia.

THE COURT:  He's already had one, hasn't he?

MR. DICKSTEIN:  Yes, your Honor.  He's had one and needs an additional.

THE COURT:  An additional one on the other side?

MR. DICKSTEIN:  Is it the other side?

DEFENDANT:  Yeah.  I had three surgeries, three hernia surgeries.

MR. DICKSTEIN:  Three hernia surgeries so far and another one to go, so a continuing problem.

THE COURT:  Okay.

MR. DICKSTEIN:  But he is very motivated to make change.  He has completed two alcohol programs.  And although he hasn't beaten his addictions, I don't know if anyone really can, but he needs additional help to get them under control.

Your Honor, we did ask for and I know the court has indicated that it is likely to grant a deviation or variance from the guidelines, but I'd like to point out that a proper

basis for that is if there's an exceptional situation where someone's consumption of alcohol has affected their judgment, and I think that this case does fall into that category. Although, that's a disfavored factor, it can be considered, and we've cited authority for why it can be considered in our sentencing memorandum.  And we submit that he did have significantly reduced mental capacity due to his addiction for the reasons stated within the memorandum.

And I'd also point out that Pretrial Services recognized as far back at his arraignment that he was abusing alcohol, even at that time.

We'd also like the court to consider respectfully that he did have a minor role in this particular offense.  There were joint objections filed where the Government and the defense agreed that he was acting as a security guard in this operation.  And I believe I'm quoting from that joint objection in saying that the Defendant is substantially less culpable than his co-defendants.

Multiple letters were written and provided to the court in his support.  I just want to point out some words from some of them.  I know the court has read them all and I know --

THE COURT:  Sure.  I'm pulling them out.  I've got them right here.

MR. DICKSTEIN:  But they indicate he's a good man and father, a great friend, contributes to the community through

volunteering as a football coach.  He's a provider and protector of his family.  He's repented and shown remorse. He's kind, loving.

Although he didn't always demonstrate it by example, his children's letter indicate that he's always at least taught them right from wrong and to do the right thing.  That his friends and family recognize he's battling sobriety, but they submitted to the court through their letters that he is salvageable.  That he betters the community, he's dependable, caring, an outstanding church member where he participates in feeding and cooking for those suffering from homelessness.

And then he's also been a great employee and co-worker.  And his boss wrote letters indicating that he's precise, eager to learn, exhibits great leadership skills, a good employee, hard worker and goes above and beyond for customers.

THE COURT:  And on time.

MR. DICKSTEIN:  And on time.  Thank you, your Honor.

THE COURT:  I only say that because I'm a stickler for that, but go on.

MR. DICKSTEIN:  I know that it's a value that this court values.

THE COURT:  Yes.

MR. DICKSTEIN:  Your Honor, I'd also ask you to consider that Pretrial Services indicates he's had no bond

violations.  He has been unemployed at times, but that's only due to his health issues.

Pretrial Services points out he has supportive family. And although there's an allegation of new criminal activity, there are no new charges.  And I'd also point out that there is a presumption of innocence.  And I understand they're recommending self-surrender.

MR. LEWIS:  We have no objection to --

MR. DICKSTEIN:  I know.

MR. LEWIS:  Okay.

MR. DICKSTEIN:  Your Honor, with regard to his counseling, he's continued in counseling.  And his counselor from Cherry Hill Center indicates that he's attended all classes, he's free from drugs and alcohol and has been testing negative and has been very active in his group.

Your Honor, he does not profess to be an angel and certainly has his struggles.  He doesn't say that this is an aberration or a one-off.  And he does acknowledge he's in need of rehabilitation.  And he accepts that he has to be punished, and the court will be doing that today.  But he does want the court to know he's motivated to make a change.

Finally, your Honor, I point out that -- one moment, please.  There's a case we didn't cite in our memorandum that I wanted to bring to the court's attention.  It's U.S. versus Grossman at 513 Fed.3d 592.  It's a 2008 Sixth Circuit case.

THE COURT:  And what do you think it says?

MR. DICKSTEIN:  What's that, your Honor?

THE COURT:  What do you think it says?

MR. DICKSTEIN:  Your Honor, I believe that case says that jail and prison aren't the only ways to provide deterrence to the defendant and people in the community, that through, as that court said, needed correctional educational and medical treatment is also a way to provide a deterrent.

That defendant, whose guidelines were 135 to 168, but had a ten-year max so the recommended sentence was ten years, that judge deviated down to 66 months, which was affirmed by the Sixth Circuit.  And the Sixth Circuit recognized that those things do provide a deterrence to similarly situated people, and I think they would in this case, most especially to Mr. Carter, but also to those who might be considering engaging in similar conduct.

So based on all of that and the arguments contained in the memorandum, your Honor, I respectfully ask the court to deviate down to -- we're asking for 36 months followed by supervised release with the court's permission for him to engage in RDAP.  I understand the Government is asking for detention in this case, your Honor, and we're leaving that to the court's discretion.  We're not opposing it based on our discussions.

THE COURT:  You're not opposing it?

MR. DICKSTEIN:  We're not opposing it.

THE COURT:  Detention?

MR. DICKSTEIN:  That's correct, your Honor.

THE COURT:  Okay.  Thank you.

Mr. Carter.

DEFENDANT:  Yes, sir.

THE COURT:  I'm sorry.

MR. ROSS:  I don't know, your Honor, if I would have an opportunity to respond to Mr. Dickstein briefly.

THE COURT:  Sure.

MR. ROSS:  Do you want me to after the Defendant?

THE COURT:  I want you to go first.  I always like the defendant to have the last word, so ...

MR. ROSS:  Understood.  I certainly appreciate -- it's always a pleasure to work with Mr. Dickstein because of the professional way in which he engages, and I'm certainly grateful for that, but the reality is we have a different view of Mr. Carter.

I had an opportunity before today to speak to John Neal who's the white collar chief in our office.  And prior to that he had tried a number of pharmacy cases in several trials in front of Judge Tarnow that we spoke about at sidebar.  And I spoke to Mr. Neal about Mr. Carter's activities and role in that particular case.  And so in the other cases, the Patel line of cases before Judge Tarnow, my understanding is

Mr. Carter came in, he debriefed.  He actually testified on behalf of the Government.  So Mr. Carter was aware of how the process for cooperating worked, and he had some experience with that system.

And we are concerned, and I have the FBI agent here who can testify about the text messages if it's necessary, but I think the thing that's important to know, and I'm sure your Honor knows this as a longtime colleague of Judge Tarnow, but I recall every time Judge Tarnow would sentence a defendant he would say admittedly to my consternation to the defendant, "Come to my chambers when you get out of prison.  I want to talk to you."

And I -- you know, I would take a view that that was an ex parte contact and it was inappropriate, and then I would say that, of course, to Judge Tarnow individually and we would have a good laugh about it and we would go on our day.  I don't know if Mr. Carter actually took an opportunity to meet with Judge Tarnow, but I do know this about Judge Tarnow and I do know this about the Probation Department in this district, as well as my office.  We are concerned about citizens returning from prison.  We do not want to see repeat defendants in this courthouse.  It's a tragedy.

And I can see that by looking at the individuals who have come here and have been respectful and they're supportive of Mr. Carter.  That is a mark clearly in his favor, and we

appreciate that.  But what we cannot countenance and we cannot condone is the fact that it appears based on the information we have from the FBI that Mr. Carter came in, pled guilty, told your Honor "I accept responsibility."  And again, he's gone through this process before with Judge Tarnow.

And he's had the opportunity to receive the tremendous services of the United States Probation Department, all of which are aimed at addiction.  They're aimed at helping people who have gambling problems, who have problems getting jobs. I've had an opportunity even to participate as a AUSA in the reentry court that Judge Borman presided over.  I don't know if that's still the case, if he still does or not, but I know how important Tracy Kosmas and the folks in our Probation Department take their role in making sure that when people leave prison they can become active and productive members of society.

Therefore, I believe Mr. Carter had those choices. And unfortunately, invariably, every time that choice has been put to Mr. Carter he choses the wrong choice.  And the only thing that seems to deter Mr. Carter, based on my review of the evidence, is incarceration.

And that's not something that we take lightly.  It's not something that we celebrate, but it's the reality.  And the reality is we are awash in opiates in this country.  It is affecting every sector of society, it is affecting rich people,

it is affecting the poor.  It is affecting people all over every part of our country.  And your Honor knows well about this problem, so I don't need to go on further.

But for those reasons, we believe this Defendant the Sentencing Reform Act requires this court impose a significant prison sentence to specifically deter him.  We believe a lengthy sentence is also necessary to provide general deterrence to people who might think, hey, I'll get involved in this.

And as your Honor well knows, these kinds of schemes require physicians, they require addicts, and they require people like Mr. Carter that can go and talk to both sides.  That's not a skill that everybody has.  Mr. Carter has that unfortunately, and he continues to use it.

And for that reason we're asking the court to impose a significant period of incarceration.  We believe the Bail Reform Act presumes that he be remanded and his bond be revoked pending designation by the Bureau of Prisons, and we have nothing further to add.  Thank you, your Honor.

THE COURT:  Thank you.

Mr. Carter, please stand please, and maybe move the microphone over to you.

Is there anything you would like to say?

DEFENDANT:  Yes, sir, your Honor.  First, I would like to apologize to the court.  I also apologize to my family who

I've let down significantly by the choices that I've made.  I am a salvageable man.  I do plan on becoming the man that my son wants me to, my wife and my daughters.

So respectfully, Judge, I would just like for you to -- anything that you feel, I'm ready to accept it.  And I appreciate everybody.  And, like I said, I apologize to the court and to my family.

THE COURT:  Tell me about your medical conditions.  You're supposed to have another hernia operation or two; is that correct?

DEFENDANT:  Yes, sir.

THE COURT:  Is the hernia in your groin or somewhere else in your body?

DEFENDANT:  Under my stomach.

THE COURT:  Under your stomach, okay.  What other medical problems do you have?

DEFENDANT:  I just had a severed foot.  I have metal in my foot.

THE COURT:  You have what in your foot?  I'm sorry.

DEFENDANT:  I broke my metatarsal in my foot.  So I just had surgery on that, and now they want to take the metal out.  And I also had bariatric surgery to lose the weight for the hernia so they can go back in and get the core of the hernia out.

THE COURT:  And did the bariatric surgery work?

DEFENDANT:  Yes.  I've lost 65 pounds.

THE COURT:  I was going to say, that jacket tells me you've lost some weight, okay.  So you were up to what, 211, so you're down to --

DEFENDANT:  I was at 351.

THE COURT:  Very good.  Very good.  And you did that after the surgery and you continuing that diet?

DEFENDANT:  Yes.

THE COURT:  And when did you have the surgery?

DEFENDANT:  I had the surgery in August.

THE COURT:  Have you had anything to drink since then?

DEFENDANT:  No, sir.

THE COURT:  Drinking, you know, puts on weight.  Not only do you get a nice buzz, but it also puts on a lot of weight.

DEFENDANT:  Yes, the sugar.

THE COURT:  And do you understand that you have a drinking problem?

DEFENDANT:  Yes, I do.

THE COURT:  Have you ever been to any kind of group therapy like, you know, group meetings like AA or anything like that?

DEFENDANT:  Yes.  I've been to AA.  I've also been to Cherry Hill.  I've been to a few classes.

THE COURT:  Okay.  I know it's tough.  It's a disease.

It's tough to -- you know, alcoholic is a disease, but you can't spread it.  You have a lot of drunk drivings and things like that, you're lucky nobody got killed.

In your report to the Probation Department you said you would like to learn a trade?

DEFENDANT:  Yes, I would.

THE COURT:  And what trade?

DEFENDANT:  I want to do HVAC.  I want to do HVAC.

THE COURT:  How about physically, do you think you can do it, I mean lifting and things like that?

DEFENDANT:  Well, I want to use more of my hands.  So after the hernia surgery I do want to get healthier.  So I'll do what I can.  I plan on living.  I'll be here in that kind of condition.

THE COURT:  And you know about it?

DEFENDANT:  Yes, yes, yes.

THE COURT:  Do you have any skills now?

DEFENDANT:  Yes, yes.  I do light carpentry work right now.  I do light carpentry work, painting.

THE COURT:  You haven't had any heating and ventilation skills yet?

DEFENDANT:  No, no.  Just --

THE COURT:  You want to learn those?

DEFENDANT:  Yes, I do.

THE COURT:  Okay.  Assuming that you get to a

institution and they didn't have that particular trade, but they had other trades, would you have any interest in those?

DEFENDANT:  Welding.  It's a few other things that I can use.  I'm pretty good with my hands.  So I want to learn to do something with my hands.

THE COURT:  And you understand that when you get out you have to have something to count on in terms of making a living?

DEFENDANT:  Absolutely.

THE COURT:  Anything else you want to tell me?

DEFENDANT:  No, sir.

THE COURT:  And your family is here?

DEFENDANT:  Yes, my wife.

THE COURT:  Tell me who's out there?

DEFENDANT:  That's my wife.

THE COURT:  Which one's your wife?

Okay.  You're the one that has inherited some homes; is that correct?

MRS. CARTER:  (Nodding.)

THE COURT:  And you're still working them and having patients and so forth?

Okay.  And who else is out there?

DEFENDANT:  That's my oldest daughter.

THE COURT:  Which one?  I forgot.  What are you doing?

Stand up.  I'm sorry.

DAUGHTER: I'm a stay-at-home mom right now. I was working at a call center. So I have two kids. I have a two-year old, about to be three, and then I have a one-year old.

THE COURT: Okay. So you're staying at home taking care of your kids?

DAUGHTER: Yes.

THE COURT: And who else is back there?

DEFENDANT: That's my little daughter.

THE COURT: Good to see you, okay. And ...

DEFENDANT: That's my son.

THE COURT: Good. And what do you do? Are you in high school?

SON: Yes.

THE COURT: And where do you go?

DEFENDANT: I go to West Bloomfield.

THE COURT: Okay. And what grade?

SON: I'm in eleventh grade.

THE COURT: And what kind of classes are you taking?

SON: I take Algebra -- I take -- I mean Algebra 2. I'm about to take precalculus and I take ...

THE COURT: Precalculus. And when you get out what do you want to do?

SON: I want to be a mechanical engineer.

THE COURT: I'm sorry?

SON:  Mechanical engineer.

THE COURT:  Oh, excellent, excellent.  Okay.  You're pretty firm on what you want?

SON:  Yeah.

THE COURT:  Okay.  Do you think you guys can keep Mr. Carter straight when he gets out, no alcohol and stuff?

I see some heads banging.  Okay.  Thanks.  I appreciate it.

Okay.  In this matter, the court has an opportunity to review the file.  You know, it's always difficult, but you have to take chances on people.  And you have to look, you know, in terms of what is a fair sentence, but not overly severe and not underly severe, because both of those matter.

In this matter, I've read over the file and have been very concerned about his criminal activity.  He has been involved in alcoholic things.  You know, it's a disease and I know it's a disease, but he's never reached bottom to do it, but perhaps now he has.  And I think he does -- I'm very impressed with these letters.  I get letters all the time, but they're usually, you know, this and that.  These are people that actually knew him, you know, 14 years.  I got a very nice letter from his daughter and so forth.  Mr. Ford's letter was -- he knew him.  He knew who he was.  He even talked about PTSD.  It was -- and his feelings about that.  I was very impressed with his boss' letter from BJ, as I just indicated.

He's always on time, he's doing what he's supposed to do. And he had the job for quite awhile.

So I think -- I looked at this and I said, well, I have to depart, because I think that the sentencing guidelines are too high in this particular matter. And I think that thanks to Booker we have been afforded the opportunity now to look at people as people as opposed to just numbers.

And I've looked at them and I'm concerned about the allegation in terms of his continuing violation, but I can't -- I'm very concerned I should say, not only a little concerned. But I hope that if he was involved that he gets indicted for it, and I'm sure he'll get slammed then and he should be. It's tough for me to take into consideration here, because I think counsel argued the right thing. If for some reason he isn't indicted, I can't go back again, so -- but I understand, and hopefully if he is indicted he gets the appropriate sentence there.

You know, he's been involved before. He's got kids. I just saw his kids. His wife was, you know, employed and so forth.

I think that the mitigating circumstances here that's driving me to want to depart in this matter is, number one, is I feel strongly that if he gets trained for coming back into society has something to do, something specific to do, he has a skill, and he's indicated he wants to, that that's an important

consideration, very important consideration.  He's young enough to get a skill.  His health, he's just indicated to me is that -- they're not the things that would prevent him from gaining a skill.  Whether it be heating, ventilation or weather it be welding, you've got to come out with skills.  You've got to come out so, boom, you have a job, you can take care of your kids, your son's going to go to college, he's going to be a mechanical engineer, he's going to need help.  I'm sure he'll put in for some scholarships and things like that, but he can't do it on his own.  He needs other help, and so you're going to have to be out there.  That's one thing that's driving me.

The other thing that's driving me is deterrence.  I think deterrence is really important.  I mean, I can't tell you how many of these cases that we have where they have -- I think the runner, whatever they call them, is the most important one.  The doctor couldn't operate without him.  The pharmacies, whoever, couldn't operate without them.  The doctors aren't going to go out on the street and, you know, go in and get people.  They're the most important link as far as I'm concerned, because -- excuse me.  They're the most important link.  I mean, we put the doctors in jail and all that.  The doctor's writing a prescription.  The middleman couldn't do it without the doctor, but the doctor couldn't do it without the middleman, because there's no way to do it so you've got to force the patients in.

So you played a very significant role in putting a lot of drugs on the street and creating a situation in our society that you have to be punished for, but the question is how much punishment you need.  I think during your punishment hopefully you will improve yourself and learn a skill and come out.

I mean, I'm also impressed with the things that you've done, you know, in terms of help in the community and hopefully you're setting an example for people in the community.

You went to the University of Alabama.  You had the world and you screwed up in this case.  All of those things just, you know, reading through it, after all these years of sentencing people, I think there's some good chance that you can get rehabilitated.

Number one, you've got to get rid of your addiction to drugs and alcohol.  Can't do anything about that.  Now you're coming down in your weight.  You'll be fine in terms of those kind of things.

So it is the belief that I should exercise my rights under Booker, that I should depart downward.  The question is where do I go.  I have to give you enough time to punish.  I have to give you enough time to deter you again, because -- I don't know about this other case, but I've got to give you enough time to deter you so when you walk out of that jail you're deterred, you're never going back into that jail.  I have to give you enough time to deter others, because there's

lots of cases out there.  And defendants talk with each other and crosstalk with each other in all kinds of cases, and so we have to send a message to the community that you can't do this.  You can't put drugs on the street and do that.  And you were at a fair level.  I mean, you weren't the highest, you know, you weren't the lowest, but you were at a fair level.

Taking all of those things into consideration, I think that the sentence in this particular matter I should use the factors in 3553.  I think they will punish adequately.  I think they will deter you adequately.  I think they will reflect the seriousness of the offense as relates to you.  I think that -- to protect the public.  I think if you come out you're either going to one way or the other, and it can happen very quickly.  And I think it will also provide the necessary education and medical needs.

Taking call of those things into consideration, it will be a sentence of the court that the Defendant be placed in the custody of the Bureau of Prisons for a period of 84 months.  That's seven years.  Let me tell you about that.

Part of the reason for that is I am going to recommend that he be in the RDAP program, which will give him time off, and hopefully he goes through the program and gets it.  And I also want to give him enough time where he can get a trade, because if you don't have enough time in prison they're not going to train you in a trade.  It's just not enough time to

get through. And I think that 84 months will, number one, afford you an opportunity to get some time off in RDAP, afford you an opportunity to learn a trade, and it will deter others. It's enough time to deter others and will also be fair punishment for you.

So you will be remanded to the custody of the United States marshals for a period of 84 months. And after the 84 months you'll be in a three-year term of supervised release. I'm going to waive any cost or fines, as I believe that you do not have the ability to pay those. That you'll pay a special assessment of $100, which is due forthwith.

You will abide by the mandatory drug testing of this court. You will provide DNA pursuant to the federal statute. While on supervised release, you'll follow all the standard terms of supervised release, and you will not use any alcohol whatsoever or drugs whatsoever. It's a zero tolerance. So no drugs or alcohol at all.

While you're on supervised release, you'll follow all the rules and regulations of the Probation Department concerning periodic testing to see if you have gone back to that. And the probation department will use their normal location, modalities and things of that nature. And you won't possess or consume any alcohol. You won't be in places that serve alcohol. That means no bars. If you go to a restaurant that has a bar, you'll be on the restaurant side. As an

alcoholic, you shouldn't be close to it anyhow.

And that the court will sign the forfeiture order that has been -- I think it's presented to us in this case.  And I think you have waived your right to appeal.

And one other thing I forgot that I'm not used to giving, but apparently pursuant to 21 USC 862 that because this is your third or subsequent conviction for controlled substance that you shall not be eligible for federal benefits, that you're ineligible for federal benefits.

So do I have -- is that mandatory?

PROBATION OFFICER:  No, your Honor.

THE COURT:  Then I'm not going to put it in.  Thank you.  I haven't seen it in the spiel here for a long time.

I want you to receive federal benefits.  You're entitled to them, for instance, if you get out and you have a trade and you get federal benefits for a short period of time until the unit or whoever is going to get you a job, but you're not going to be on welfare and you're not going to -- you've got to work.

And the other condition I just thought of it is that you will have a job full time, 40 hours a week, and provide the documentation to the Probation Department.

Mr. Ross.

MR. ROSS:  Your Honor, may I speak to Mr. Dickstein?

THE COURT:  Of course.

MR. ROSS:  Thank you.

(At 12:36 p.m., briefly off the record.)

MR. ROSS:  Your Honor, it's interesting given my past as a forfeiture lawyer, and current I dabble in it still from time to time.  I was not aware of any forfeiture in Mr. Carter's plea agreement, and I -- but I certainly appreciate the court noting that as required by the rule.

I've had an opportunity to discuss this with his counsel.  We don't believe there's anything to forfeit.  I will go back to the office --

THE COURT:  That's fine.  It was in the Rule 11.  So Probation, doing what they're supposed to do and did a great job, put it in their reports and it was discussed.

MR. ROSS:  And I appreciate that.  I just don't know ultimately that --

THE COURT:  That's fine.  It's supposed to be done.  I just learned that.  I never knew that before.  My law clerk taught me that you have to do forfeiture before sentencing.

MR. ROSS:  I heard a wise AUSA once made that argument.

THE COURT:  That's right.  I've learned.  I've been reading all about it.  There's a whole article that -- I never read the magazine.  It's called "Champion."  You know, it's the national defense magazine.  I just put them on her desk, you know.  And so when I'm working that case she gave me the

"Champion" back because it had a whole article on forfeiture.

MR. ROSS:  I didn't -- I will tell your Honor I don't always strive to be consistent with the National Association of Criminal Defense Attorneys, but I am happy that they were able to provide some reinforcement to that --

THE COURT:  I'm not saying that they did that.  I'm not sure that that's what they did, but they did discuss it in a defense counsel's view.  But I think -- it's okay.  I didn't really read it hard, because it was at the end.  It was the last thing to read.

MR. ROSS:  Well, I met Judge Surhheinrich one time, and I don't want to do anything to not follow his direction, so thank you.

THE COURT:  Anyhow, I've learned a lot from just reading the case.  It's all I've been doing.

Okay.  Anything else?

Oh.  He's been remanded by stipulation.  Anything else?

And I can't designate, I'll tell you why.  Number one is they usually don't listen to me.  And number two is -- in fact, I just thought of this, too.  On the judgment please put it is recommended by the court that he be placed in a facility that has a trade of heating, ventilation and cooling.

MR. DICKSTEIN:  Thank you, your Honor.

THE COURT:  They may not listen to me, but at least

they know he wants to go to a trade.

MR. DICKSTEIN: Thank you, Judge.

THE COURT: Yes.

MR. DICKSTEIN: Your Honor, my client did request. I don't know if the court has the ability to make a recommendation or not, but he's most interested in going to Morgantown in West Virginia.

THE COURT: I don't know if I can make recommendations, because I want him to go to a facility that has RDAP. I want him to go to a facility that has training for him. They don't listen to me anyhow, but I want them to listen to me to send him someplace -- I want him to go to RDAP so he can get time off, and he needs it desperately, and then I want him to get training. I'd rather make the recommendation that he go to an institution that has these programs than tell the Bureau of Prisons which one to go to.

MR. DICKSTEIN: I understand, your Honor. Thank you.

THE COURT: Thank you. And he'll be remanded by stipulation.

And we'll call for Mr. Carter, because I want to just tell the jurors a few things and I'm going to let them go to lunch so we can get the attorneys in. If you could call down to the marshals and have them bring Mr. Carter and tell them that we have also have --

THE CLERK: Mr. Rogers.

THE COURT:  I'm sorry, Mr. Rogers.  And that we also have Mr. Carter who is waiting for them, okay.

MR. ROSS:  Thank you, Judge.

THE COURT:  Thank you.

MR. LEWIS:  Thank you, your Honor.

(The proceedings were adjourned at 12:40 p.m.)

–  –  –

CERTIFICATE OF COURT REPORTER

I, Sheila D. Rice, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages is a correct transcript from the record of proceedings in the above-entitled matter.

_s/Sheila D. Rice_____
Sheila D. Rice, CSR-4163, RPR, RMR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  03/28/2023
Detroit, Michigan.